348 P.2d 935

Charles JOSEPH, Tamara Lee Joseph, and Melanie Joseph, by Their Guardian ad litem, Charles Joseph, Plaintiffs and Appellants,

v.

W. H. GROVES LATTER–DAY SAINTS HOSPITAL, a corporation, Defendant and Respondent.

No. 9068.

Supreme Court of Utah.

Jan. 26, 1960.

McBroom & Hanni, Salt Lake City, for appellants.

Ray, Quinney & Nebeker, Albert R. Bowen, Salt Lake City, for respondent.

CROCKETT, Chief Justice.

This is the second appeal by the plaintiffs from a jury verdict of no cause of action for the death of the family mother, Mrs. Lucille Joseph, alleged to have been caused by the negligence of the defendant hospital. On the former appeal the case was remanded for a new trial because of the exclusion of evidence pertaining to data upon the hospital records.[1] That evidence was admitted during the subsequent trial, and a jury again returned a verdict of no cause of action, from which this appeal is taken.

The issue raised on this appeal is that the trial court erred in refusing to include the theory of res ipsa loquitur in submitting the case to the jury.

On April 4, 1953, Mrs. Joseph was operated on for removal of an ovarian cyst and received transfusions of two pints of blood, one during the operation, and the other after being returned to her room. There is evidence that during the second transfusion she manifested symptoms of undue distress; that she began to perspire; and also to shake as if chilling. Ten days later she died in the hospital of lower nephron nephrosis (inflammation of the kidney that prevents it from functioning) which appears to have resulted from an incompatible blood transfusion reaction.

The claim of negligence is that the hospital failed to exercise proper care in (a) typing and matching the blood; (b) administering the transfusion; and/or (c) failing to stop giving the transfusion after an unfavorable reaction was or should have been noticed.

At the conclusion of the evidence plaintiffs' counsel made an oral request that in submitting the case the court include the theory of res ipsa loquitur. While the court submitted the case on other grounds, it refused the request, assigning these reasons: that it had not been pleaded; that plaintiffs had elected to rely upon and prove specific acts of negligence; and that the evidence does not provide a proper foundation for the application of that doctrine.

Conceding the plaintiffs' argument that under proper circumstances neither the failure to expressly plead res ipsa loquitur,[2] nor the fact that specific acts of negligence are proved[3] would preclude the submission of the case on that doctrine, we proceed to consider the more fundamental proposition: whether the evidence here

1. 7 Utah 2d 39, 318 P.2d 330.
2. Angerman Co. v. Edgemon, 76 Utah 394, 290 P. 169, 79 A.L.R. 40; Loos v. Mountain Fuel Supply Co., 99 Utah 496, 108 P.2d 254.

3. See Annotations: 79 A.L.R. 48 and 160 A.L.R. 1450.

would have justified submission of the case upon that theory.

The doctrine of res ipsa loquitur springs from the very practical process of drawing logical conclusions from circumstantial evidence. Its purpose is to permit one who suffers injury from something under the control of another, which ordinarily would not cause the injury except for the other's negligence, to present his grievance to a court or jury on the basis of the reasonable inferences to be drawn from such facts, even though he may be unable to present direct evidence of the other's negligence.

The doctrine appears to have been first clearly articulated in our law in two now famous cases at about the same time. The first of these is Byrne v. Boadle,[4] decided in 1863. The plaintiff, walking in a public street, was injured when a barrel of flour fell upon him from the window above the defendant's shop. Chief Baron Pollock said:

"It is the duty of persons who keep barrels in a warehouse to take care that they do not roll out. * * *

* * * * * *

"I think it apparent that the barrel was in the custody of the defendant who occupied the premises, and who is responsible for the acts of his servants who had control of it; and in my opinion the fact of its falling is prima facie evidence of negligence, and the plaintiff who was injured by it is not bound to shew that it could not fall without negligence, but if there are any facts inconsistent with negligence it is for the defendant to prove them."

Two years later Chief Justice Erle's often quoted statement of the doctrine was given in the case of Scott v. The London and St. Katherine Docks Company,[5] which involved an injury occasioned by falling bags of sugar:

"There must be reasonable evidence of negligence.

"But where the thing is shewn to be under the management of defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

The foundational principles upon which res ipsa loquitur rests, as set forth in those

4. 2 H. & C. 722, 159 Eng.Reports 299.
   10 Utah 2d—7

5. 3 H. & C. 596, 159 Eng.Reports 665.

two English cases, remain unchanged[6] although there has been some variation in applying it to different fact situations.[7]

Whether the trial court was justified in refusing to submit the instant case upon that theory involves consideration of two problems:

First, was the injury one which would not have happened in the normal course of events unless the defendant were negligent; and

Second, was the defendant's conduct in relation to the occurrence explained in such manner as to preclude any reasonable finding of negligence on its part. We discuss these problems in reverse order.

The giving of blood transfusions has become a well recognized means of medical therapy. and the techniques employed in connection with giving them is standardized. The hazard of an adverse reaction is also well known and res ipsa loquitur has been applied in some cases where it is shown that the evidence will sustain a finding that the wrong type of blood is actually given.[8] However, the facts here are somewhat different.

The evidence delineated the complete procedure followed by the hospital thus: the blood is taken from a donor of proper age, health and condition either by a registered nurse or under her direction by one skilled in the art. Sterile equipment is used and the blood is run directly into a pint bottle. Three small sample tubes, which are used in typing and matching the blood, are taken at the same time and are given the same number as the pint bottle. Before a transfusion is given, a sample of the patient's blood is taken. It is also typed and then matched and crossed-matched with the donor's blood in the sample tubes. The testimony is that these procedures were employed here; that they were in accordance with generally recognized professional standards; that they showed Mrs. Joseph's blood to be type A, Rh positive, the most common type of blood; and that by the same tests the donor's blood was determined to be of the same type. In addition to the standard tests, another one, called the Indirect Coombs Test, was made · which also confirmed that the blood was compatible.

There is no suggestion in the evidence that there were any other precautions

6. See Wightman v. Mountain Fuel Supply Co., 5 Utah 2d 373, 302 P.2d 471, in which we recently set forth the elements essential to application of the doctrine.
7. Shain, Res Ipsa Loquitur, Presumptions and Burden of Proof, pp. 440 to 477 (1945).

8. Sherman v. Hartman, 137 Cal.App.2d 589, 290 P.2d 894; See Annotation: Liability for injury or death from blood transfusion, 59 A.L.R.2d 768.

which might have been employed in connection with the typing and matching of the blood. Upon the basis of the foregoing evidence the trial court concluded that defendant had made such explanation of its conduct in the selection of the blood as to preclude any reasonable finding that it was negligent in that regard.

One is caused to wonder: if the above cautions were observed, how could an adverse reaction have occurred? This questions is closely related to and brings us to a consideration of the second major problem: does the fact that a reaction did occur necessarily indicate that there was negligence. While it is realized that res ipsa loquitur has been applied in various fields where an injury occurs which is not to be expected if proper standards of care and skill are observed. But this is done only with caution, particularly in the medical field because of the realization that many aspects of the treatment of human ills cannot yet be regarded as exact science and a bad result may obtain even though recognized standards of care and skill are employed.[9]

■ According to the evidence in this case there can be no certainty that there will be no adverse blood reaction even when the best methods known to medical science are used in the typing and matching of the blood. The expert witnesses testified that even when such procedures are followed, hemolytic reactions [10] nevertheless occur in about one to five per thousand transfusions and that death may result in from twenty-five to thirty per cent of those suffering such reaction. (The defendant hospital gives about 6,000 transfusions per year.) Upon the basis of that evidence, even if it be assumed that Mrs. Joseph suffered a hemolytic reaction, it cannot be said that the trial court was in error in adopting the view that this is something that may have occurred without negligence.

In the light of the considerations above discussed we are not disposed to disagree with the ruling that there was no proper foundation to submit the case to the jury on the question of res ipsa loquitur.

■ It is apparent, however, that there are known hazards involved in giving blood transfusions and this would, of course, impose upon those administering them the duty of exercising the utmost care and vigilance for the safety of the patient. This includes not only the preliminary steps in taking, typing and matching the blood, which were satisfactorily explained, but also the duty to make careful observation of the patient during the transfusion for

9. Salgo v. Leland Stanford Jr. University Board of Trustees, 154 Cal.App.2d 560, 317 P.2d 170; see also footnote 8, supra.

10. Destruction of the red corpuscles.

100

any indications of an adverse reaction. It was upon this latter issue that the case was submitted to the jury as to the negligence of the defendant.

The jury were properly advised that they were the sole judges of the issues of fact and that they could draw all reasonable inferences naturally arising from the evidence. In the light of such instructions and upon the basis of the evidence they did not find the defendant negligent, and this is the second jury which has so held.

What the parties are entitled to and the law seeks to afford is an opportunity for one claiming a grievance which would justify legal redress to present it to a court or jury and to have a fair trial. When this is done, and the verdict and judgment are entered, all presumptions are in favor of their validity.[11] The burden is upon the appellant not only to show that there was error, but that it was prejudicial to the extent that there is reasonable likelihood that in its absence there would have been a different result. We find no such error here.

Affirmed. Costs to defendant (respondent).

WADE, HENRIOD, McDONOUGH and CALLISTER, JJ., concur.

11. See U.R.C.P. Rule 61; Watkins v. Utah Poultry & Farmers Cooperative, 122 Utah 459, 251 P.2d 663, 668.