In the Matter of the ESTATE of Robert A. MORTON, Deceased.

Robert J. MORTON and Charles R. Morton, Appellants (Contestants below),

v.

M. S. REYNOLDS, as Executor of the Estate of Robert A. Morton, Deceased, Mr. Emilio Veniegas, and The First Presbyterian Church of Cheyenne, Appellees (Proponents below).

No. 3551.

Supreme Court of Wyoming.

June 8, 1967.

Walter C. Urbigkit, Jr., Cheyenne, for appellants.

Paul B. Godfrey, Ward A. White, Cheyenne, for appellees.

Before GRAY, McINTYRE, and PARKER, JJ.

Mr. Justice GRAY delivered the opinion of the court.

Robert A. Morton, a longtime resident of Cheyenne, Wyoming, died February 27, 1965, and was survived by Robert J. Morton and Charles R. Morton, his nephews and only legal heirs. Following his death a purported will dated May 12, 1960, was offered for probate by M. S. Reynolds as the executor named therein, and in due course the instrument was admitted to probate as the last will and testament of said decedent.

Within the time fixed by § 2–83, W.S. 1957, the nephews, hereinafter called the contestants, who had been disinherited, filed their petition seeking to have the order admitting the will to probate set aside and the letters testamentary issued to M. S. Reynolds revoked.

The claim of contestants was set forth in four separate counts. The first count al-

leged on information and belief that a subsequent will naming contestants as beneficiaries or devisees had been formally executed by the decedent and had superseded the 1960 will; that such will was in possession of M. S. Reynolds; and that it had not been produced. In this connection the record discloses that no such subsequent will was ever found, and so far as we can determine that part of contestants' claim has been abandoned. The second and third counts, considered together, alleged in substance that two letters in the handwriting of decedent attached to the petition, dated December 18, 1961, and July 27, 1963, respectively, constituted a holographic will which revoked the 1960 will, or in the alternative that the letters constituted a codicil revoking in part the 1960 will "at least to the extent that specific bequests are therein made" to the contestants. The fourth count alleged, in the alternative, that at the date of the execution of the 1960 will the decedent lacked legal competency to make a last will and testament.

The proponents, M. S. Reynolds, The First Presbyterian Church of Cheyenne, Wyoming, and Emilio Veniegas, filed separate answers in essence denying contestants' claims; alleged that the 1960 will was the only testamentary instrument left by decedent; and that prior to the date of the letters described the testator had been declared incompetent and a guardian had been appointed for his person and estate. When the matter came on for trial and after each of the parties had presented their evidence and rested, the proponents moved for a directed verdict on the ground that contestants had failed to present sufficient evidence to sustain their burden of proof. The motion was granted and judgment entered accordingly. From that judgment the contestants appeal.

Many claimed errors have been advanced by the contestants relating to procedural and evidentiary rulings. While those contentions have all received consideration, it has been concluded that we can dispose of this appeal by directing our attention to those matters that strike us as presenting the important questions in the case, which in turn will eliminate to a large extent the necessity of separate discussion of each and every ruling of which contestants complain.

One of the most bothersome questions in the case is the contention of contestants, presented under different theories, that a new trial must be granted for the reason that they were entitled to and did not receive a trial of all of the material issues in the case. In disposing of this contention we limit our consideration to the issues framed by the petition and the proponents' answers thereto inasmuch as those matters form the basic premise for contestants' complaints.

We have set forth above the substance of the grounds upon which contestants relied to sustain their claim that the 1960 will was invalid in whole or in part. While we might well agree that some clarification would have been helpful, it is our view that the petition when liberally construed, tendered two primary issues, the first of which was that the 1960 will had been revoked in whole or in part by the described subsequent holographic instruments. While some argument is made by the proponents that such an issue is not material in a will contest, we disagree. Without question it was a matter that challenged the "validity and subsistence" of the 1960 will. In re Stringer's Estate, 80 Wyo. 389, 345 P.2d 786, 789. See also § 2–83, W.S.1957; Bearman v. Camatsos, 215 Tenn. 231, 385 S.W.2d 91, 95. The second primary issue, alleged in the alternative, was that decedent was incompetent to execute the 1960 will. The issues so tendered were controverted by the proponents and we agree with contestants, to this extent at least, that such were the issues when the case came on for trial.

For some reason, however, which is not readily apparent from the record—no pretrial having been held and no separate trial of the issues having been ordered pursuant to the provisions of Rule 42(b), W.R.C.P., which in part provides for separate trial of issues deemed incompatible—the trial court

undertook to limit and did limit the issues in the trial of the case to the matter of incompetency. That much is conceded by the proponents. Yet at the conclusion of the evidence the trial court directed the jury to return a verdict finding "generally for the proponent-defendants and against the plaintiff-contestants" and that the 1960 will "be not set aside or revoked." On the basis of that verdict, judgment was entered nonsuiting the contestants.

■ We hold that this was error. The material issue of claimed revocation was never tried. It is the function of the trial court in a case such as we have here initially to determine the law and the jury to determine the facts. Buckman v. United Mine Workers of America, 80 Wyo. 199, 339 P.2d 398, 402, rehearing denied 342 P.2d 236. That, however, does not furnish the complete answer to contestants' contention that they are entitled to a new trial of all of the issues in the case. As will be later developed, we have concluded that the contestants did receive a fair trial on the incompetency issue; and the underlying question is, Can the error made be cured by the ordering of a partial new trial on the revocation issues?

■ We think it can and that this should be done. We have jurisdiction of the case for the reason that the appeal is from a judgment of nonsuit. The circumstance presented, as we view it, falls within the scope of Rule 72(h), W.R.C.P., which provides as follows:

"Where a judgment is reversed in part for error relating only to an issue which is in no way dependent for its proper trial on any other issue or issues found to have been properly tried, and a partial new trial may be had without prejudice or injustice to any of the parties concerned, the cause may be remanded for the trial of the issue alone upon which the error was committed."

While it must be conceded that there is a relationship between the two primary issues to the contestants' claim of the invalidity of the 1960 will, we are not persuaded that either was dependent upon the other in the trial of the case or that the proposed disposition would result in prejudice or injustice to any of the parties. That decision, of course, is ours to make, Cottier v. Sullivan, 47 Wyo. 72, 31 P.2d 675, 678; but we think it is aided by the apprehensions of the trial court, apparent from the record, not only that the issues were not interdependent but to undertake to try them together might well confuse a jury and result in prejudice to all of the parties.

■ That brings us to the next broad question of whether or not the trial court erred in directing a verdict for the proponents on the ultimate issue of the competency of the decedent to execute the 1960 will, and in discussing this question we shall also make reference to certain subsidiary questions raised by the contestants. The principal contention of contestants in this regard is that there was sufficient substantial evidence presented by them to require submission of the matter to the jury. That, of course, will entail some analysis of the evidence. In doing so we keep in mind the prevailing rule that on a directed verdict at the close of the taking of evidence consideration will be given to all evidence favorable to the contestants, together with the reasonable and legitimate inferences which may be deduced therefrom. In re Draper's Estate, Wyo., 374 P.2d 425, 427; In re Lane's Estate, 50 Wyo. 119, 60 P.2d 360, 363–364.

■ We point out also that there is no ready formula for disposing of this phase of a will contest. To a great extent the outcome of each case is dependent upon the facts and circumstances present. In previous cases we have, of course, set forth certain guides that must be observed by the trier of the facts in determining the ultimate factual question of testamentary capacity; and it may be helpful to state in a general way the elements essential to show testamentary capacity, most of which we have recognized, and what Page on Wills says has "finally been agreed upon" in

substance by most courts. 1 Page on Wills, § 12.21, pp. 606–608 (1960), states:

"* * * Testator must have sufficient strength and clearness of mind and memory, to know, in general, without prompting, the nature and extent of the property of which he is about to dispose, and nature of the act which he is about to perform, and the names and identity of the persons who are to be the objects of his bounty, and his relation towards them. He must have sufficient mind and memory to understand all of these facts, and to comprehend these elements in their relation to each other, and a charge, in negative form, that capacity is lacking if testator is not able to know all of these facts, is erroneous, since he lacks capacity if he is unable to understand any one of them. He must be able to appreciate the relations of these factors to one another, and to recollect the decision which he has formed."

■ It is also the rule in a will contest that the burden is upon the contestants to show by a preponderance of the evidence the claimed testamentary incapacity unless it develops that previous incompetency of a testator is admitted or sufficiently shown. In re Faragher's Estate, Wyo., 367 P.2d 972, 976; In re Lane's Estate, 50 Wyo. 119, 58 P.2d 415, 419, rehearing denied 60 P.2d 360; Wood v. Wood, 25 Wyo. 26, 164 P. 844, 852.

In their brief contestants have categorized the evidence upon which they rely as follows:

"(a) Evidence of incompetency.

(b) Unusual disposition of evidence as basis of jury consideration.

(c) Circumstances involving appointment of a guardian as a basis for jury consideration.

(d) Evidence of other wills as evidence sufficient to require jury consideration."

We shall endeavor substantially to follow that pattern.

By way of general information the record discloses that at the time testator executed the 1960 will he was 85 years of age. His wife of many years died in the year 1956 and they had no children. The wife left surviving certain other relatives to whom the testator made bequests of $1,000 each; and, as stated above, the only legal heirs of the testator were the nephew-contestants, who were not mentioned in the will and who were disinherited. By the will testator also bequeathed to the proponent Emilio Veniegas, who had become acquainted with the testator in 1958 and performed many services for him, the sum of $5,000, which testator said was for the purpose of paying off the mortgage on the beneficiary's home. The First Presbyterian Church, to which testator's wife belonged and contributed during her lifetime, was named as the residuary devisee and legatee. The appraised value of testator's estate was the sum of $55,473, of which $40,000 was assigned to certain business properties which the testator, orally and in writing before and after the execution of the 1960 will, had often expressed an intention to leave to the contestants.

### Testimony of Incompetency

Robert J. Morton, a contestant, testified that he was the son of testator's only brother and lived in Salmon, Idaho; that testator used to visit them in Idaho but after 1956 the witness didn't "believe" testator was "mentally and physically" able to travel; that in June 1959 he and his wife and his brother visited testator in Cheyenne, Wyoming; they could see testator was "slipping physically and getting more forgetful every year," but his difficulty was "mostly physical" in getting around; that in 1963 testator had written he wanted to come to Idaho so the witness came here in the summer of 1963 to see if he was able; but after consulting with Dr. Pattison of the church and Dr. McShane, testator's physician, it was decided he was not able; and in their visits with testator "he seemed to forget he wanted to go."

Emilio Veniegas, called by contestants as an adverse party under Rule 43(b), W.R.C.P., testified that testator was staying at his home when he became "sick" and was taken to the hospital and he visited him there about every day. On cross he said that testator was always "happy" and his mind was "alright" and in May 1960 he noticed no change in testator's mental condition.

Melvin Condron, owner of the Pioneer Hotel where testator lived from the fall of 1958 to April 1960, testified that when testator moved there he was always neat and careful of his dress but this began to change in the fall of 1959; that he would go out and come back with his pants soiled from voiding in public and did not realize it; that witness would send the pants to the cleaners but testator objected that "somebody will steal" them; that he had been a good checker player but completely lost his ability; that he was "just troubled with money" and would forget about whether he had paid his rent and was an easy mark on one or two occasions to the wiles of unscrupulous persons; that testator was physically unable to climb stairs unassisted and moved for that reason; and that during this period testator had undergone a complete change of personality, "physically and forgetfulness both." On cross the witness stated the testator was a "wonderful business man and keen man" up to the last; that he knew what property he owned except he was mistaken about another business property which he had previously deeded to his wife's brother; that about January 1960 the witness became concerned over testator's physical condition but his mind was still operating alright; and that up until that time testator had maintained himself very well, although "I am sure he lost [his] grasp of money that fall."

Dr. K. L. McShane, testator's family physician since 1946, said testator was taking some medication for diabetes and arteriosclerosis in the year 1959; that in the spring of 1960 testator was not taking his medicine or taking care of himself physically, was voiding in public, and "was getting in poor sanitary shape"; that he hospitalized testator on April 20, 1960, and at that time "his mental condition was good"; that arteriosclerosis was a "condition of aging of the circulatory system" and while it affects the brain, the results are variable and he observed no "abnormal change" in testator "for a man his age"; that on occasion testator would become belligerent because he wanted to go home but at other times he was very cooperative and gave no trouble and this was "just a normal aging process"; that between April and October 1960 there was some noticeable deterioration in testator's mental condition but not a sudden change, and it had been reported to him by the nurses that testator was writing checks promiscuously and without apparent reason and "I felt he was not able physically to take care of his affairs, and I felt he might not be using the best judgment"; that he arranged with M. S. Reynolds, an attorney and the scrivener of the 1960 will, to have a guardian appointed for testator—to which further reference will be made—and that he was the primary source of the information stated in the petition; and that one of the physical characteristics of aging is usually instability creating some hazard with balance, "and the characteristic of mental aging is usually manifested by emotional upsets and poor judgment." On cross the doctor testified that testator's mental condition at the time he entered the hospital "was fairly normal"; that patients even though giving some indication of senility may yet have "ordinarily good judgment and ability to handle their affairs, and go along through life pretty well"; and he gave it as his opinion that testator could make testamentary disposition of his property on May 12, 1960. On redirect the doctor said he did not think there was any change in testator's testamentary capacity from the time he entered the hospital until his discharge, which was on June 1, 1961.

Walter Jensen, manager of the Cheyenne Credit Bureau, the tenant of one of testa-

tor's business properties, testified that he had known the testator since 1927; that since January 1958 he had seen him almost daily; that testator's general condition was good in 1958 but there was some deterioration in his physical condition and by early 1960 testator "had failed a good deal"; wasn't as alert as he had been in the past and "would tell you one thing one day and the next day he would probably tell you something else"; that he would be contrary one day and in a "very good mood" the next; that testator was having trouble with his "bodily functions" and would not keep himself clean; and that in April or May or the early part of June testator asked him about contacting an attorney, other than Reynolds, to draft a will for him. On cross-examination he said that during the period of his acquaintance with testator he was attentive to business and quite conscious of his bank account, his income, and his money. The witness reiterated that testator had become forgetful but that was of "minor importance" when testator was taken to the hospital because of his general physical condition; that testator seemed to be undergoing a gradual aging process that could be expected of a man of his age; and that he noticed nothing of a serious nature about testator's mental condition, although he had slipped a lot "physically and mentally" between the time he first knew him and May 12, 1960.

In addition to the foregoing testimony it seems advisable here to make reference to some documentary evidence. The contestants offered in evidence a bound volume of the hospital record of testator's treatment there for the period April 20, 1960, to June 1, 1961, consisting of some 187 pages. It was offered for the purpose of showing the general course and history of the infirmity and treatment of the testator. The court sustained an objection to the exhibit on the ground that it was incompetent and immaterial. Thereupon the contestants undertook to make offers of proof of certain portions of the record, but to say the least such offers were general in nature, were

fragmentary and indefinite, and in our opinion were insufficient to apprise the trial court of just what portions contestants were attempting to offer. While contestants claim and argue here that such ruling was prejudicial error, we do not think so.

■ In support of their arguments contestants advance the well-recognized rule that hospital records when relevant to the issues of a case are generally admissible under the Uniform Business Records as Evidence Act—§§ 1–170 to 1–173, inclusive, W.S.1957—after a proper foundation has been laid. Zerbinos v. Lewis, Alaska, 394 P.2d 886, 889; Weis v. Weis, 147 Ohio St. 416, 72 N.E.2d 245, 250, 169 A.L.R. 668; Mayor v. Dowsett, 240 Or. 196, 400 P.2d 234, 247; Young v. Liddington, 50 Wash.2d 78, 309 P.2d 761, 765; Joseph v. W. H. Groves Latter Day Saints Hospital, 7 Utah 2d 39, 318 P.2d 330, 332–333; 10 Utah 2d 94, 348 P.2d 935; 32 C.J.S. Evidence § 728 (b) p. 1033. We have no quarrel with that rule but that does not mean that all the material contained therein is ipso facto admissible. The entries must relate to acts, occurrences, or events relevant to the diagnosis and treatment of a patient's condition. See authorities above and 32 C.J.S. Evidence § 728(c), pp. 1036, 1037.

■ Here we think a proper foundation was laid, and in keeping with the foregoing we have gone to some trouble to search through such record. Undoubtedly there were entries which, had they been properly tendered, should have been admitted. For example, an entry on April 23, 1960, made by a nurse, reported that testator was belligerent; had his clothes on wanting to go home; threatened to sue the hospital and attendants; threatened to kill the nurse; was very profane; and a day or so later tried to call the police. There were also entries in the first few days that testator was "lethargic," was "confused," and was "weaker and more malaise." However, beginning on May 5, 1960, and running through the critical time here—May 12, 1960—there were entries that testator was "more alert," was "talking more clearly," had good days

and nights, voiced "no complaints," and was up walking in the halls. It also records visitations by Dr. McShane on the day before and the day after the execution of the will. While we will take these matters into consideration for purposes here, we do not hold that the court erred in excluding the exhibit which was offered as a whole and which contained a vast amount of immaterial and cumulative matter. It was not the job of the trial court to separate the wheat from the chaff.

Certain letters in the handwriting of the testator—the first of which was written in February 1961—from which it could be inferred that testator had forgotten the terms of his will are also in evidence.

 Keeping in mind that some further reference to the evidence will be made under the separate headings below, we think the foregoing constitutes a fair presentation from a voluminous record of evidence to be considered under the heading here being discussed. Our analysis of it is, particularly when the testimony of contestants' witnesses is scrutinized in keeping with their cross-examination, that at best it tends to show no more than the testator was in poor physical condition, forgetful, untidy and unclean about his person, not as alert as in the past, contrary and belligerent on occasion, suspicious, encountered some minor difficulty with money matters, and in general was undergoing a gradual aging process in keeping with his age. Such matters, collectively or alone and without more, do not establish mental incompetency to make a will. In re Nelson's Estate, 72 Wyo. 444, 266 P.2d 238, 244; In re Wilmott's Estate, Fla., 66 So.2d 465, 467, 40 A.L.R.2d 1399; In re Heazle's Estate, 74 Idaho 72, 257 P.2d 556, 558; Tye v. Tye, 312 Ky. 812, 229 S.W.2d 973, 975; McGrail v. Schmitt, Mo., 357 S.W.2d 111, 119, 9 A.L.R.3d 1; In re Phillip's Estate, 15 Wis.2d 226, 112 N.W.2d 591, 595; 1 Page on Wills, § 12.27, pp. 627–629 (1960).

## Unnatural Will

For purposes of discussion we will combine the contestants' points of the claimed unusual disposition of the 1960 will and the evidence of other wills, which for obvious reasons we confine to the 1957 will.

The 1957 will with one exception made bequests to the same relatives of testator's deceased wife as did the 1960 will. It also made the same bequest to Florence Morton, mother of contestants, and this bequest was deleted in the 1960 will, which no doubt can be explained by the fact that Mrs. Morton was then in the hospital afflicted with cancer. It also devised the business properties to the nephews which, as we have seen, was also deleted from the 1960 will. Both wills named the church as the residuary devisee and legatee. The claim of contestants is directed at the change in disposition of the business properties.

On the basis of the 1957 will and the declarations of the testator mentioned above, and with one of them apparently made near the time of the 1960 will according to Veniegas, we will agree that a consistent purpose on the part of testator to leave the business properties to the contestants was indicated. The only explanation offered by proponents for the deletion was Reynolds' testimony that testator in the conference preceding the drafting of the 1960 will had said that the contestants "had enough and he wasn't going to leave them any more." The record also discloses that testator was on friendly terms with contestants but at the same time their visits were infrequent and there was no really close association between them.

 The subject matter here has been rather fully discussed in previous cases of this court. In re Merrill's Estate, 80 Wyo. 276, 341 P.2d 506, 509; In re Nelson's Estate, supra, 266 P.2d at 246; In re Johnston's Estate, 63 Wyo. 332, 181 P.2d 611, 615–616; Branson v. Roelofsz, 52 Wyo. 101, 70 P.2d 589, 595. From those cases it is clear that an unnatural, unreasonable, or unjust disposition of a testator's

property is a circumstance, together with other circumstances, that must be considered on the question of testamentary capacity. Support therein is also furnished for contestants' argument that the will here was unnatural in that it was contrary to testator's expressed views. Nevertheless, we need not decide that question. Contestants concede that such fact, standing alone, is insufficient to establish testamentary incapacity, citing In re Doty's Estate, 89 Cal.App.2d 747, 201 P.2d 823; In re Cissel's Estate, 104 Mont. 306, 66 P.2d 779; Collins v. Collins, 110 Ohio St. 105, 143 N.E. 561, 38 A.L.R. 230; 3 Page on Wills, § 29.40, p. 493 (1961); and, as we pointed out above, the contestants failed to produce sufficient other evidence of incapacity to support the argument that the claimed unnaturalness of the will was the product of an unsound mind.

### The Guardianship

Within a few months after the 1960 will was executed, as mentioned above, a guardian was appointed for the testator. The contestants, in the trial, offered in evidence the petition for such appointment, the order of the court making an appointment, and the inventory and appraisement of the guardianship estate. The instruments throughout refer to the testator as an "incompetent." The proponents objected on the ground that the exhibits were irrelevant and immaterial, and the objection was sustained. The contestants' attack on such ruling is twofold. They first argue that the ruling was error and, secondly, that they were prejudiced in that it deprived them of important evidence in their chain of proof. We do not agree.

In the first instance they were permitted to get into evidence through Dr. McShane and through Reynolds the fact that testator had been declared "incompetent" on October 28, 1960, together with that part of the petition which reads:

"That the said Robert A. Morton is over the age of Eighty years and is Incompetent. That he is writing checks in large amounts to everybody and is unable to take care of the small amount of business he has, to receive rents, and pay bills."

While we accept the argument that the proffered documentary evidence should not have been excluded under the circumstances here present on the basis of the objection made, we think it was cumulative and therefore the ruling was not prejudicial error. Furthermore, the petition on its face and the testimony disclose that the proceedings related primarily to the management of testator's property. Thus it was entitled to little or no weight. In re Merrill's Etate, supra, 341 P.2d at 510. The situation here is readily distinguishable from that which was present in In re Ingram's Estate, Wyo., 384 P.2d 1020, 1021.

In this connection we will also mention the contestants' claim that the trial judge unduly restricted cross-examination of the witness Reynolds—called by the proponents—in regard to the guardianship and to other matters surrounding the preparation and execution of the 1960 will. Without undertaking to set forth the specifics of their complaint, we simply say that we have examined them and we are not convinced that the rulings made constituted a grave abuse of discretion. We have recognized, of course, that wide latitude should be permitted in the cross-examination of an adverse witness, Friesen v. Schmelzel, 78 Wyo. 1, 318 P.2d 368, 370, but here the trial judge did permit extensive cross-examination and the inquiry excluded related largely to cumulative and repetitious matters and matters that were clearly outside the scope of the direct.

### Conclusion

From the foregoing and as already indicated, there is nothing disclosed by the record that alters the rule imposing the burden of proof upon the contestants on the issue of incompetency. Under those

circumstances and even though we give to the evidence presented every benefit to which contestants are entitled, we cannot say as a matter of law that there was sufficient substantial evidence from which a jury could find that the testator lacked mental capacity to know and comprehend the basic elements essential to the making of the 1960 will and which had previously been admitted to probate. We hold that the trial judge properly determined that contestants had not met their burden on the issue tried and thus did not err in directing a verdict on that phase of the contest.

However, in view of our holding that a partial new trial must be granted on the issues relating to revocation of the 1960 will, the judgment will be modified with directions to reopen the case for further proceedings in accordance with this opinion. In all other respects the judgment is affirmed.

Judgment affirmed as modified.

HARNSBERGER, C. J., not participating.

McINTYRE, Justice (dissenting in part and concurring in part).

Mr. Justice GRAY has reviewed fully and fairly the evidence shown in the record pertaining to the competency or incompetency of Robert A. Morton, at the time his will dated May 12, 1960 was executed. On the basis of the record, Justice GRAY has concluded a prima facie case of incompetency was not made out by the contestants, and that a directed verdict for the proponents of the will was proper.

On the basis of the same record, I think a prima facie case of incompetency was made out; that the issue of incompetency should have been submitted to the jury; and that a directed verdict should not have been granted against the contestants.

I concur in the conclusion that this case should be remanded to the district court for a partial new trial on the issue of revocation of the May 12, 1960 will.